U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    JAN 16, 2013

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO.: 10-329 |
| v. | * | SECTION: "I"(5) |
| DANTE CARSON<br>a/k/a "Tae" | * | |
| | * | |

\*   \*   \*

## FACTUAL BASIS

The above-named defendant, **DANTE CARSON a/k/a "Tae"** ("**DA. CARSON**"), has agreed to plead guilty as charged to Counts 1, 5, and 10 of the Third Superseding Indictment in this matter. Should this matter proceed to trial, the United States of America will prove beyond a reasonable doubt, through credible testimony of Special Agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), state and local law enforcement agencies, the production of reliable witnesses, and evidence, the following facts in support of the allegations against defendant **DA. CARSON**. The following proffer of the Government's evidence is intended only to provide the Court with enough evidence to satisfy the mandate of Rule 11(b)(3) of the Federal Rules of Criminal Procedure. This factual basis is not intended to be a disclosure of all the evidence available to the Government nor, to the extent it makes representations concerning anything the defendant said, is it a recitation of all that the defendant said.

## COUNTS 1, 5, AND 10 – RICO AND FIREARM CONSPIRACIES, AIDING AND ABETTING IN THE UNLAWFUL ACQUISITION OF A FIREARM

Beginning on a date unknown, but around 2008, and continuing up to on or about January 27, 2012, in the Eastern District of Louisiana and elsewhere, the defendant **DA. CARSON**, associated with an enterprise known as "Harvey Hustlers/Murder Squad." The "Harvey Hustlers" originated in the Harvey area of Jefferson Parish. Its members "hustled" meaning they distributed illegal narcotics, particularly cocaine base. The original goal of the Harvey Hustlers was to make money from the sale of illegal narcotics. The "Murder Squad" also referred to as "MS," is a neighborhood group composed primarily of individuals residing in the Harvey area of Jefferson Parish, Louisiana. The Murder Squad ("MS") is a faction of and part of the Harvey Hustlers organization. While they primarily operated on the Westbank of Jefferson Parish, members would conduct business in other parts of the Eastern District of Louisiana.

As such, the Harvey Hustlers/Murder Squad, was an enterprise, as defined in Title 18, United States Code, Section 1961(4), because it was comprised of a group of individuals who associated-in-fact for a common purpose. A principal objective of the Harvey Hustlers/Murder Squad was to obtain money through the illegal trafficking of controlled substances, including cocaine base ("crack"), cocaine hydrochloride, heroin, and marijuana. Other purposes of the enterprise included the following: (a) preserving and protecting the power, territory, and profits of the enterprise through the use of intimidation, violence, threats of violence, assault, and murder; (b) promoting and enhancing the activities and authority of the enterprise and its members and associates; (c) keeping victims, potential victims and witnesses in fear of the enterprise and in fear of its members and associates through violence and threats of violence; (d) providing financial support and information to members of the enterprise, including those who were incarcerated for committing acts of violence, robbery, distribution of controlled substances

and other offenses; and (e) providing assistance to members of the enterprise who committed crimes for and on behalf of the enterprise in order to hinder, obstruct and prevent law enforcement officers from identifying the offender or offenders, apprehending the offender or offenders, and prosecuting and punishing the offender or offenders.

The Government's evidence regarding the existence and nature of the Harvey Hustlers/Murder Squad would come from various sources, including but not limited to, the testimony of lay witnesses and cooperating individuals, police searches and seizures, historical arrests of the enterprise's members, and recorded telephone conversations between and among enterprise participants. Collectively, the evidence would show that the members of the Harvey Hustlers/Murder Squad included, among others **MELVIN HUDSON**, a/k/a "Kane," a/k/a "Keenan," (**"M. HUDSON"**), **JERMAINE HUDSON**, a/k/a "Fresh," (**"J. HUDSON"**), **TRAVIS HUDSON** (**"T. HUDSON"**), **MOSES LAWSON**, a/k/a "Moes," (**"LAWSON"**), **MONTERIO WIGGINS**, a/k/a "Peedy," (**"M. WIGGINS"**), **RODERICK WIGGINS**, a/k/a "Chucky," a/k/a "Donald Carson," (**"R. WIGGINS"**), DA. CARSON, **DWIGHT CARSON**, a/k/a "Coobie," (**"DW. CARSON"**), **TOREY RICHARDSON, a/k/a "Toe,"** (**"RICHARDSON"**) and **TEDRICK REYNARD**.

D.W. was the highest ranking member of the Harvey Hustlers until his death in September 2010. **J. HUDSON** and **M. HUDSON**, were ranking members (lieutenants) of the Harvey Hustlers. D.W. was both feared and respected in the Harvey neighborhoods and maintained almost complete control over the drug distribution in the area. Also, **M. HUDSON** and **J. HUDSON** distributed narcotics to lower ranking members of the Harvey Hustlers. In September 2010, D.W. was murdered. **J. HUDSON** and **M. HUDSON** then succeeded D.W. as the leaders of the organization. Even before D.W. was killed, **M. HUDSON** was a leader of the

3

Murder Squad. In the beginning, members of the Harvey Hustlers and Murder Squad were able to co-exist and function as a group. Some members of Murder Squad were also Harvey Hustler members. However, a rift formed over some unsanctioned Harvey Hustler criminal activity.

**DA. CARSON** was a member of the organization and responsible for street level distribution of narcotics and the acquisition of firearms. In order to maintain Murder Squad status, members of the Murder Squad, which included **M. HUDSON, J. HUDSON, LAWSON, M. WIGGINS, R. WIGGINS, DA. CARSON, DW. CARSON**, and **RICHARDSON** were expected to participate in the following gang activity: intimidate other gangs and/or individuals who tried to sell narcotics in Harvey, LA, collect drug debts, threaten and/or intimidate potential or actual witnesses and their family members who were suspected of cooperating with law enforcement, and to assist other Murder Squad gang members in robberies and shootings.

**DA. CARSON** began selling drugs from the age of seventeen (17). **DA. CARSON** earned money from drug sales. During that time span, **DA. CARSON** was responsible for greater than 280 grams but less than 840 grams of cocaine base. **DA. CARSON** would usually purchase $100 worth of cocaine base when needed. Further, **DA. CARSON** observed both **LAWSON** and **DW. CARSON** distribute cocaine base on prior occasions. **DA. CARSON** sold the cocaine base in the Scotsdale neighborhood of Harvey and in other areas of the West Bank of both Jefferson and Orleans Parishes. **DA. CARSON** has a several tattoos on his body including tattoos identifying himself as a member of both the Harvey Hustlers and Murder Squad.

**DA. CARSON** and **DW. CARSON** became associates of **RICHARDSON** between 2008-2009. During that time, **DA. CARSON** and **DW. CARSON** introduced **RICHARDSON** to unindicted co-conspirator "Dee," a supplier of cocaine base. **DW. CARSON**'s mother would obtain rental vehicles for their personal use although they had no driver's licenses. **DA.**

CARSON and **DW. CARSON** usually sold drugs out of these cars rather than on a street corner, meaning they would deliver drugs to their customers. **DA. CARSON** and **DW. CARSON** originally considered themselves to be Murder Squad members but after D.W.'s murder, they became affiliated with the Harvey Hustlers.

On April 11, 2009, Jefferson Parish Deputies observed as a vehicle disregarded a traffic signal at the intersection of Avenue H and US90B. Deputies stopped the vehicle. As **R. WIGGINS**, the driver, exited the vehicle, a deputy smelled marijuana. **DW. CARSON** was the front seat passenger. **DA. CARSON** was the rear seat passenger. Using a K-9 dog, the officers located a plastic baggie that contained marijuana under the passenger side seat. Laying next to the baggie was a Ruger model Security Six, .38 caliber revolver, serial no. 150-63987. Under the driver's side seat, the deputies located a Taurus Model PT-132 Millennium, .32 caliber semi-automatic firearm, serial no. FUI88215.

On March 11, 2010, **R. WIGGINS** was a passenger in a silver Chevrolet Cobalt. The driver of the car, **MOSES LAWSON ("LAWSON**), made a right turn from Opelousas Street onto Hendee Street without using a turn signal. A New Orleans Police officer conducted a traffic stop of the vehicle. The police officer approached the vehicle and determined that it contained five (5) individuals including the driver. The officer detected an odor of marijuana that originated from the car. Once back-up arrived the officers determined that: (1) **R. WIGGINS** was the front seat passenger; and (2) **DW. CARSON, DA. CARSON, MONTERIO WIGGINS ("M. WIGGINS")** were all seated in the rear of the car.

When **LAWSON** exited the vehicle, the officers observed a plastic bag that contained ecstasy, a Schedule I, drug controlled substance, located inside the driver's side door handle. When **R. WIGGINS** exited the car, an officer observed a nickel plated handgun on the front

passenger floorboard. As the officer handcuffed **R. WIGGINS**, a clear plastic bag that was later determined to contain eight (8) pieces of cocaine base fell from **R. WIGGINS's** left pants pocket. The firearm was a loaded Cobra Enterprises Model FS380, .380 caliber semi-automatic firearm, serial no. FS020546. Police officers located an extra magazine in **R. WIGGINS's** front left pocket and $190.00 in his right front pocket. A forensic scientist employed by the New Orleans Parish Crime Lab analyzed the suspected illegal narcotics recovered from **R. WIGGINS** and determined that is was cocaine base, a Schedule II narcotic drug controlled substance.

The officers determined the **DW. CARSON** possessed a bag that contained seventeen (17) pieces of what was later determined to be cocaine base. The officers retrieved from **DW. CARSON** $216.00 in his right front pocket. **DW. CARSON** possessed a Baikal model IJ-70, .380 caliber semi-automatic pistol, serial number J039423 when he sat inside the car.

In March of 2010, both **DA. CARSON** and **DW. CARSON** approached C.F. and asked her to purchase firearms on their behalf. **DA. CARSON** and **DW. CARSON** told C.F. what firearms to purchase. **DA. CARSON** gave C.F. the money to purchase the firearms. The firearms to be purchased were semi-automatic handguns. At the time, both **DA. CARSON** and **DW. CARSON** were under twenty-one (21) years of age. Therefore, they were prohibited from possessing such firearms. That is why they convinced C.F. to assist them to purchase the firearms on their behalf.

C.F. falsely stated on a 4473 form from the Bureau of Alcohol, Tobacco, Firearms, and Explosives that she was the actual buyer of the firearms, when in fact, the actual buyers were **DA. CARSON** and **DW. CARSON**. On March 26, 2010, C.F. purchased a Ruger model P95, 9 millimeter semi-automatic firearm, serial no. 319-02213 from Top Dollar Pawn, a federally licensed firearms dealer. On March 30, 2010, C.F. purchased a Glock model 27, .40 caliber

semi-automatic firearm, serial no. MVV816 from BJ's Pawn Shop, a federally licensed firearms dealer. Also on March 30, 2010, C.F. purchased a Taurus model PT-145 Millennium Pro, .45 semi-automatic firearm, serial no. NAS33397 from Cash America Pawn of New Orleans, a federally licensed firearms dealer. Each federally licensed firearms dealer relied on C.F.'s statements before consummating the firearms sales. C.F. transferred the Taurus firearm to **DA. CARSON** and the Glock firearm to **DW. CARSON**.

On April 1, 2010, the electrical supply to C.F.'s apartment was cut-off. C.F. shared the apartment with **DA. CARSON** and **DW. CARSON**. Occasionally, **LAWSON** and **M. WIGGINS** would stay overnight. Neither **DW. CARSON** nor **DA. CARSON** was employed at the time but earned their money selling cocaine base. On April 1, C.F. decided to drive to her sister's house to take a shower. **LAWSON** drove **DA. CARSON, DW. CARSON, M. WIGGINS**, C.F., and D.S. (**DW. CARSON's** girlfriend) to the house. C.F. and D.S. observed that **LAWSON, M. WIGGINS, DA. CARSON,** and **DW. CARSON** all possessed firearms while riding in the red Camry.

That same day, **DA. CARSON** called **RICHARDSON** and stated that they were going to handle "that thing" in the Boondocks. **RICHARDSON** will state that the "Boondocks" were located in the vicinity of Lac Couture Dr. in Harvey, Louisiana. **RICHARDSON** will also state that did not know exactly what exactly **DA. CARSON** was referring to but he suspected that a crime was about to be committed. After several prior attempts to collect payment of a drug debt, **LAWSON, M. WIGGINS, DA. CARSON,** and **DW. CARSON** drove to Reginald Francois's ("Francois") house in a red Camry rental vehicle and told Reginald's brother, C.Fr. that Francois needed to pay them. C.Fr. told them Francois planned on paying them. Also, C.Fr. observed that all four (4) possessed firearms. The four (4) defendants left but **LAWSON** later contacted

7

Francois via a cell phone and after a verbal exchange, instructed Francois to meet them near Lac Couture Drive.

Francois drove over to Lac Couture Drive and left his car running. Francois stayed there until he was confronted by **M. WIGGINS** and **DA. CARSON**. **M. WIGGINS** and **DA. CARSON** shot Francois several times. **M. WIGGINS** and **DA. CARSON** ran back to the red Camry where **LAWSON** and **DW. CARSON** were located. Several residents from the apartment complex called 911 and police responded. The police observed as several residents surrounded Francois attempting to administer CPR. Francois laid face-up with several .40 casings near-by. Emergency services arrived at the scene but Francois died before he arrived at the hospital. Francois's autopsy revealed that he was shot six times. The killing wound was to Francois's lower abdomen where it severed his aorta artery and lacerated his liver.

Using a vehicle description from the witnesses and their License Plate Recognition Camera System, law enforcement authorities determined the license plate number Red Toyota Camry. A computer check revealed that the red Camry was registered to the Hertz Rental Company ("Hertz"). Investigators contacted Hertz and determined that A.C. rented the red Toyota Camry.

**RICHARDSON** stated that after Francois was murdered, **DA. CARSON, DW. CARSON,** and **M. WIGGINS** picked him up in a rental car and they headed to C.F.'s house. **DA. CARSON** told **RICHARDSON**, "I got me one." **RICHARDSON** interpreted **DA. CARSON's** statement to mean that **DA. CARSON** killed someone. **DA. CARSON** told **RICHARDSON** that **M. WIGGINS** shot Reginald Francois, and **DA. CARSON** finished him off. **DW. CARSON** took part in the conversation.

The next day, C.F. learned that someone was murdered around the corner from her sister's house on April 1, 2010. C.F. asked **LAWSON** about the murder. **LAWSON** stated that **DA. CARSON** and **M. WIGGINS** committed the murder. **DA. CARSON** and **M. WIGGINS** overheard their conversation and admitted to killing Francois. **DA. CARSON** stated that, "He did not know if he was going to do it at first." That is when **M. WIGGINS** shot Francois. **DA. CARSON's** then shot Francois but his gun jammed and **M. WIGGINS** finished Francois off."

**DA. CARSON** used **M. WIGGINS's** .40 caliber Millennium firearm to shoot Francois. **M. WIGGINS** used **LAWSON's** .40 caliber firearm to shoot Francois. When an individual complained that the shootings were carried out using the guns the C.F. had straw purchased, **DW. CARSON** stated that "They did not use them guns."

On or about April 3, 2010, C.F. attempted to drive the Carson brothers to Atlanta so they could "lay-low." Police received information that the red Toyota Camry was observed in Harvey, Louisiana. Officers located the red Camry and conducted an investigatory stop. **DW. CARSON** sat in the front passenger seat and **DA. CARSON** sat in the rear driver's side seat. Law enforcement officials located the Glock and Taurus firearms in C.F.'s purse. **DA. CARSON** and **DW. CARSON** placed the firearms into C.F.'s purse just prior to their arrests. **DA. CARSON** and **DW. CARSON** both made statements to Jefferson Parish law enforcement authorities that they, **M. WIGGINS**, and **LAWSON** each possessed firearms on the day of Francois's murder. They rode over to the "Lacs" with **LAWSON** and **M. WIGGINS**. They both initially stated (falsely in part) that **LAWSON** and **M. WIGGINS** killed Francois.

Through his actions, **DA. CARSON** knowingly agreed to facilitate the commission of at least two racketeering acts constituting a pattern to be committed by any member of the conspiracy. Both **DA. CARSON** and **DW. CARSON** sold cocaine base on numerous occasions,

carrying firearms in their waist bands for protection and to gain the respect of others. Accordingly, **DA. CARSON** adopted the goal of facilitating RICO violations.

The enterprise had an effect on interstate commerce as the enterprise's members continuously procured drugs (mainly cocaine base) and firearms to carry out the organization's mission. The drugs and weapons all came at some point from outside the State of Louisiana. Also, members of the enterprise, including **DA. CARSON**, used cell phones and rented vehicles (instrumentalities of commerce) to conduct the affairs of the enterprise. The level of the drug trafficking, the size of the enterprise's operation, and the longevity of the enterprise, had at least a de minimis effect of interstate commerce.

READ AND APPROVED:

_____    1/16/13
DUANE A. EVANS                      DATE
Assistant United States Attorney


_____ 1/16/13    _____
JASON R. WILLIAMS                           DATE
Counsel for Defendant Dante Carson


_____ 1/16/13    _____
DANTE CARSON                                DATE
Defendant